# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2023

Lyle W. Cayce
Clerk

———————

No. 21-11244

———————

IN THE MATTER OF: RE PALM SPRINGS II, L.L.C.

*Debtor*,

SR CONSTRUCTION, INCORPORATED,

*Appellant*,

*versus*

HALL PALM SPRINGS, L.L.C.; RE PALM SPRINGS II, L.L.C.,

*Appellees*,

_____

IN THE MATTER OF: RE PALM SPRINGS II, L.L.C.

*Debtor*,

SR CONSTRUCTION, INCORPORATED,

*Appellant*,

*versus*

RE PALM SPRINGS, L.L.C.; HALL PALM SPRINGS, L.L.C.,

*Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 3:20-CV-3486, 3:20-CV-3487

Before Higginbotham, Southwick, and Higginson, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

Federal bankruptcy provisions date to the Founding, embedded into our Constitution as a core tenet of the country's economic vitality.[1] And with good reason: "[d]ebt was an inescapable fact of life in early America . . . [that] cut across regional, class, and occupational lines,"[2] and debtor's prisons were antithetical to the new democratic ideal. So, in parallel with the industrialization and modernization of our markets, the Bankruptcy Code matured, its execution shifting to an independent court staffed by an array of able judges selected by merit and expert in the field,[3] giving bankruptcy courts with their new status a crucial role in freeing the entrepreneurial energy indispensable to our nation's economy. It is on this stage that the current action arrives, an effort to salvage the building of a hotel in the face of market demands shrunk by the covid virus and other difficulties.

## I.

SR Construction held a lien on real property owned by RE Palm Springs II.[4] The property owner is a corporate affiliate of Hall Palm Springs

---

[1] *See* U.S. Const. Art. I, § 8, cl. 4 (endowing Congress with the power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States").

[2] Bruce Mann, Republic of Debtors: Bankruptcy in the Age of American Independence 3 (2002).

[3] *See generally* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984).

[4] RE Palm Springs II was initially named Hall Palm Springs II LLC.

No. 21-11244

LLC, who had financed the original undertaking for a separate real estate developer. The latter requested leave of the bankruptcy court to submit a credit bid to purchase the property from its affiliate, which the bankruptcy court granted. The bankruptcy court later approved the sale and discharged all liens. The construction company appealed the bankruptcy court's credit-bid and sale orders. Finding that the lender was a good faith purchaser, the district court affirmed the bankruptcy court and dismissed the appeal as moot under Bankruptcy Code § 363(m). Now, "[a]cting as a second review court,"[5] we AFFIRM.

## II.

### A.

In November 2016, Palm Springs, LLC, a commercial real estate developer and the original owner of real property in Palm Springs, California, contracted with SR Construction to develop its Property and build a hotel, but it did not go well. Approximately a year later, the developer financed the construction with Hall Palm Springs LLC,[6] securing its loan with a deed of trust. At the same time, it entered into a separate Subordination Agreement with the construction company, giving the lender priority of repayment over the construction company.

The developer terminated the construction company on October 22, 2019, owing it $14,151,000 for the work completed. Nine days later, the developer and owner defaulted on loan obligations owed to the lender, and the lender gave notice that it was accelerating the debt. The construction

---

[5] *Matter of Lopez*, 897 F.3d 663, 668 (5th Cir. 2018) (quoting *Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 538 (5th Cir. 2015)).

[6] Note that the developer (Palm Springs, LLC) and the lender (Hall Palm Springs, LLC) are unrelated, and the record does not reveal any overlap in ownership.

company then filed its mechanic's lien on the Property on November 25, 2019.

**B.**

In January 2020, the construction company filed suit in California state court against myriad parties, including both the developer and the lender, seeking to foreclose on its mechanic's lien as superior to other liens and the lender's deed of trust.

On February 12, 2020, the lender's president formed an affiliated corporate entity (the "affiliate") and became its sole manager and organizer. Following the lender's acceleration of the debt, the developer conveyed the Property to the affiliate pursuant to a conveyance agreement "as an alternative to foreclosure." By its terms, the developer would be "released from [its] obligations with respect to the [l]oan and [the developer] shall be entitled to a net profits interest in the Property" in the amount of 50 percent. The affiliate intended to finish construction and develop the hotel, but more trouble came; "with the impact of the novel coronavirus COVID-19 on the hospitality industry, coupled with the filing of numerous lawsuits . . . [the lender] concluded that the sale of the Hotel to a strategic buyer would yield the maximum value for all parties."

Within the ensuing six months, the lender and its affiliate undertook several discrete actions to prepare for bankruptcy. In June 2020, the affiliate changed its name, and around the same time, the lender retained $r^2$ Advisors ("$r^2$"), a third-party with relevant experience, to oversee the affiliate's restructuring. To ensure arm's-length objectivity, as represented to the bankruptcy court, the lender "caused . . . to convey ownership of [the affiliate] to $r^2$" such that "the entire sales process [wa]s under the control and supervision of $r^2$."

No. 21-11244

Then, on July 22, 2020, the affiliate filed for bankruptcy in the Northern District of Texas and filed motions for leave to hire a pre-selected real estate agent, to authorize the affiliate to borrow funds from the lender (its corporate affiliate), and to approve specific bankruptcy sales and bidding procedures.

## C.

The bankruptcy court held multiple hearings and on August 24, 2020 approved the retention of r² as the restructuring organization and the bidding and sales procedures, complimenting the Parties for presenting "a game plan that could . . . get creditors paid in full quite soon," observing it "not an unusual game plan" in high stakes financing. The bankruptcy court then approved a proposed real estate broker, finding the firm "well qualified" and lacking any conflicts or impairments. And, finally, it approved the debtor-in-possession loan from the lender as "the only game in town" with substantively "reasonable" conditions in light of the circumstances. This left the lender, as the debtor-in-possession, with the power to veto any sale. The bankruptcy judge followed with related orders formally approving the needed processes and personnel.

One of the orders approved an auction and bidding process requiring a "stalking horse,"[7] McWhinney Real Estate Services, Inc., to submit its bid on August 28, 2020, alongside a nonrefundable $2.5 million deposit. Other

---

[7] "A stalking horse refers to an entity that is willing to place a bid on a debtor's asset in order to either set a baseline bid from which the true value of the estate can be assessed or serve as a catalyst to inspire other bidders." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 744 (3d Cir. 2021) (citations omitted); *see also Matter of Walker Cnty. Hosp. Corp.*, 3 F.4th 229, 232 n.2 (5th Cir. 2021) ("'An initial bidder' in a bankruptcy proceeding may serve as a so-called 'stalking horse,' whose initial research, due diligence, and bid may encourage later bidders." (alteration and quotation marks omitted)).

bidders in the auction were required to submit bids and deposits by October 5, 2020, the sale hearing to be held eleven days later.

The marketing and sale of the Property garnered substantial interest. The real estate brokerage engaged in an aggressive marketing campaign, hosting site visits from "8 potential buyer groups" and executing approximately 268 confidentiality agreements from potential buyers seeking to perform due diligence. Several bids were proposed, though none conformed to the specified format, timing, or financial arrangements approved by the bankruptcy court. The stalking horse also submitted a proposal for $35,450,000, though it ultimately declined to make the deposit by the deadline and backed out entirely.

Prior to the auction deadline but after the stalking horse had dropped out, with no outstanding bids, the lender sought leave to submit a credit bid for the Property pursuant to 11 U.S.C. § 363(k), which confers secured creditors a right to credit bid their allowed claims.[8] The construction company opposed, urging that the bid was "premature." While the construction company contested the credit bid, the auction proceeded apace, ultimately garnering only the lender's credit bid of $37,279,365.74—almost $2 million more than the floor set by the stalking horse's proposal.

The bankruptcy court held evidentiary hearings on November 3, 5, and 6, 2020 regarding the lender's ability to submit a credit bid and on the free and clear sale of the Property. In broad strokes, the construction company argued—as it does here—the sale should not proceed because: 1) the lender (and intended purchaser) was aware of adverse claims to the

---

[8] *See* 11 U.S.C. § 363(k) ("At a sale . . . of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.").

Property, namely the construction company's adversary proceeding as well as its action in California state court; and 2) because the lender had fraudulently manipulated the bankruptcy proceedings, including rigging the bankruptcy sale process, to acquire the Property free and clear of all liens at the lienholders' expense, including the construction company's.

At the culmination of the final hearing, the bankruptcy court approved the sale. Shortly before the hearing concluded, the construction company moved for a stay pending appeal, which the bankruptcy court denied. Three days later, the bankruptcy court issued its formal order granting the lender's Motion to submit a bid, and on November 18, 2020, a formal order approving the sale free and clear of all liens, claims, encumbrances, and interests and, in so doing, denying the construction company's motion to stay the sale. These orders gave rise to this appeal.

Parallel to its objection, the construction company sought to bar the developer from conveying the Property to the affiliate or another non-party entity. It filed an adversary proceeding in the bankruptcy court against the lender, the affiliate, and the developer. The construction company also brought a separate action in California seeking a determination that its lien on the Property is senior to the lender's deed of trust.

## D.

The construction company timely filed notices of appeal of the bankruptcy court's orders to the district court, which consolidated the appeals, affirmed the bankruptcy court's finding that the lender was a good-faith purchaser, and dismissed the appeal as moot. The construction company timely appealed.

No. 21-11244

## III.

A purchaser bears the burden of establishing good faith under 11 U.S.C. § 363(m)[9] and a district court's dismissal of an appeal from bankruptcy court as moot is reviewed *de novo*.[10] The standard of review for a good-faith determination by the bankruptcy court that renders the appeal moot "is a matter of some confusion in our circuit."[11] No published opinion in this Court has weighed in conclusively on the choice between *de novo* or clear error review, and one unpublished opinion filed years ago reviewed such a finding for clear error but with no analysis of the standard.[12] More recently, this Court declined to reach the question because a determination of good faith failed "under either standard of review."[13] We take this path again. As the lender prevails under *de novo* review, we need not and hence do not address the less rigorous clear error standard.

## IV.

The Bankruptcy Code makes clear that "[t]he reversal or modification on appeal of an authorization . . . of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith . . . unless such authorization and

---

[9] *In re TMT Procurement Corp.*, 764 F.3d 512, 520 (5th Cir. 2014).

[10] *See In re Ginther Trusts*, 238 F.3d 686, 688 (5th Cir. 2001) (per curiam).

[11] *In re TMT*, 764 F.3d at 521.

[12] *See In re Beach Dev., LP*, No. 07-20350, 2008 WL 2325647, at *1–3 (5th Cir. June 6, 2008) (unpublished) (per curiam) (referencing repeatedly the fact that the parties failed to show clear error absent analysis as to the correct standard of review).

[13] *In re TMT*, 764 F.3d at 521.

such sale . . . were stayed pending appeal."[14] "The Bankruptcy Code does not explicitly define 'good faith,'" but this Court has "defined the term in two ways": (1) a notice-based definition, wherein a "good faith purchaser" is "'one who purchases the assets for value, in good faith, and without notice of adverse claims'"; and (2) a conduct-based definition, meaning one who does not engage in "'misconduct'" including, *inter alia*, "'fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders.'"[15] We review the construction company's claim under each test in turn.

## A.

The construction company argues that the lender is not a good faith purchaser because there were live "adverse claims" of which the lender was aware. "The Bankruptcy Code does not provide a definition of '*adverse claim.*'"[16] It only defines a "*claim*": (1) the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;" or (2) the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent,

---

[14] 11 U.S.C. § 363(m). Here, the authorization and sale of the Property were not stayed pending appeal. Accordingly, a determination that the lender acted in good faith moots this appeal. *In re TMT*, 764 F.3d at 519.

[15] *In re TMT*, 764 F.3d at 521 (citations and footnotes omitted) (first quoting *Hardage v. Herring Nat'l Bank*, 837 F.2d 1319, 1323 (5th Cir. 1988); and then quoting *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981)).

[16] *Id.* at 522 (emphasis added).

matured, unmatured, disputed, undisputed, secured, or unsecured."[17] We have described this definition of "claim" as "broad[]."[18]

The Parties dispute the breadth of this definition when "claim" is read in conjunction with the word "adverse," as this Court has not yet precisely defined "adverse claims." In *In re TMT*, we stated only that "knowledge that there are objections to the transaction is not enough to constitute bad faith."[19] In other words, an adverse claim "requires *more*" than simply "some creditor . . . objecting to the transaction and . . . trying to get the district court or the court of appeals to reverse the bankruptcy judge."[20]

Citing *Black's Law Dictionary*, the construction company contends both that "a claim can be adverse even if it does not arise from a color or claim of title," and that its adversary proceedings in the bankruptcy court, which would "avoid the transfer of the [P]roperty to [the affiliate]" and "thus remov[e] the [P]roperty from the bankruptcy estate," are adverse. The construction company also points to its "pre-petition California state-court suit asserting that [its] liens are senior in priority to the lender's deed of trust and seeking to foreclose on the [P]roperty" as an adverse claim satisfying this threshold. Finally, the construction company contends that the bankruptcy and district courts improperly considered the *merits* of its adversary proceedings and California suit to influence their findings rather than the lender's *knowledge* of such actions. By contrast, the lender, citing *Ballentine's Law Dictionary*, argues that the term "adverse claim" "connotes an 'element

---

[17] 11 U.S.C. § 101(5).

[18] *In re TMT*, 764 F.3d at 522.

[19] *Id.* (quoting *In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982)).

[20] *Id.* (emphasis added) (quoting *In re EDC Holding Co.*, 676 F.2d at 947).

No. 21-11244

of hostility under a color or claim of title'" such that neither the objection nor the state court action nor the federal bankruptcy adversary proceeding rise to an "adverse claim" required to nullify the sale.

In *In re TMT*, this Court invalidated a bankruptcy sale because "[t]he [debtor-in-possession] Lender had knowledge that a third-party, entirely unrelated to the bankruptcy proceeding, had an adverse claim *to* the [property]" in the form of an ownership interest.[21] Given such a claim, this Court concluded that the lender "d[id] not qualify as a good faith purchaser,"[22] citing to the Seventh Circuit case *Rock Industries*, which connects a "good faith purchaser" to ownership because the "purchaser [wa]s seeking to extinguish adverse claims *to* title."[23] *Darby v. Zimmerman (In re Popp)*,[24] a Ninth Circuit Bankruptcy Appeals Panel took the same course, reversing a sale order approved by the bankruptcy court because "[t]he parties dispute[d] title *to* the [p]roperty" sold.[25] Finally, the Supreme Court explains that "adverse claims" with regard to good faith purchasers implies ownership must be disputed, stating that the knowledge required to vitiate such a label is of "defect in [title], or adverse claim *to* it."[26] These cases make clear that, under the notice-definition of a good faith purchaser, the threshold for an "adverse claim" is a dispute in ownership interest. The

---

[21] *Id.*

[22] *Id.*

[23] *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

[24] 323 B.R. 260 (B.A.P. 9th Cir. 2005).

[25] *Id.* at 262.

[26] *Boone v. Chiles*, 35 U.S. 177, 210 (1836) (emphasis added) ("Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser, who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it."). Truly, a longstanding precedent.

district court here held that the construction company "has not asserted an ownership interest," "only a mechanic's lien," the claims filed by the construction company do not rise to the level of an "adverse claim" so as to vitiate the lender's status as a "good faith purchaser."

The construction company cites language from *Rock Industries* that notice of adverse claims "*usually* becomes an issue when an alleged good faith purchaser is seeking to extinguish adverse claims *to* title of which he had no actual or constructive notice at the time of sale."[27] It argues this language implied that the concern "could also arise in other circumstances" beyond concerns as to defects in title, such as the one here. But it is equally plausible that the Seventh Circuit's inclusion of the qualifier "usually" speaks to the frequency of title claims or notice thereof, not to the elements of an adverse claim. Adopting the construction company's reasoning *arguendo*, *Rock Industries* did not articulate such a scenario,[28] that is even if this lone 44-year-old out-of-circuit precedent were binding,[29] the inclusion of "usually" is dicta.[30] A greater concern forecloses lowering the standard to claims below questions of ownership interests: doing so, as the lender points out, would open the proverbial floodgates and "countless sales under [S]ection 363 of the Bankruptcy Code would be invalid," which, this Court has held, stands

---

[27] *In re Rock Indus.*, 572 F.2d at 1198 (emphases added).

[28] *See id.*

[29] *See, e.g.*, *United States v. Penaloza-Carlon*, 842 F.3d 863, 864 & n.1 (5th Cir. 2016) (holding that other circuits' decisions are persuasive only).

[30] *See United States v. Wallace*, 964 F.3d 386, 389 (5th Cir.) (stating that where "discussion" is "established . . . as dicta, [it is] therefore not binding"), *cert. denied*, 141 S. Ct. 910 (2020); *United States v. Stracener*, 959 F.2d 31, 32 (5th Cir. 1992) ("As pure dicta, the Court's parenthetical comment does not have binding force."); *Carpenter Paper Co. v. Calcasieu Paper Co.*, 164 F.2d 653, 655 (5th Cir. 1947) ("These statements, however, as the opinion itself shows, were dicta not necessary to the decision of the case and not intended to have the force of a binding adjudication.").

antithetical to "Congress's strong preference for finality and efficiency in the bankruptcy context."[31]

The construction company also points to two separate actions as adverse claims. First, the construction company relies on its state court action filed prior to the bankruptcy petition, which asserts that the construction company's lien is superior to the lender's deed of trust and that the construction company has the right to foreclose on the Property to enforce its security interest. But a lien does not confer ownership rights, and the construction company does not suggest otherwise. The transfer of the Property by the developer to the affiliate, subject to the encumbrances against the Property—including the construction company's—does not implicate ownership rights or give rise to a distinct ownership dispute, meaning that it does not constitute an "adverse claim."

Second, the construction company asserts that the adversary proceedings in the bankruptcy court brought under California law constitute "adverse claims," even under the ownership interest standard. They do not. Several of the provisions to which the construction company points this Court, California Civil Code §§ 3439.04–05, make transfers voidable as to the specific creditor involved in that transaction, not to all creditors.[32] Thus, under these provisions, that a third party—here, the construction company—believes the conveyance between two other parties is fraudulent does not confer to that third party the right to void the transfer.

---

[31] *In re Energytec, Inc.*, 739 F.3d 215, 218–19 (5th Cir. 2013) (quoting *Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359, 363 (4th Cir. 2006)).

[32] The only other provision to which construction company points the court, California Civil Code § 3439.02, is inapposite, as it simply defines insolvency without creating a private right of action. *See* Cal. Civ. Code § 3439.02.

No. 21-11244

California Civil Code § 3439.07 is the lone salient provision pointed to by the construction company. It provides for the "[a]voidance of the transfer or obligation," among other forms of equitable relief.[33] But as the district court correctly observed, the lender "was the senior lien holder" given the subordination agreements lienholders signed—including the construction company. This contractual agreement neuters the construction company's claim to equitable relief under this provision. It follows that the adversary proceedings in the bankruptcy court do not constitute adverse claims.

In sum, neither a mechanic's lien nor an adversary proceeding to find that a transfer may be voidable (not that it is void) constitute an "adverse claim" affecting a purchaser's good faith status in bankruptcy proceedings. We hold that the lender does not fail this Court's notice-of-adverse-claims test and retains its status as a "good faith purchaser."

## B.

The construction company also argues that the lender is not entitled to "good faith purchaser" status because it engaged in misconduct and fraud. We disagree. This Court has previously stated that "misconduct" including "fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders" could "destroy a purchaser's good faith status."[34] The construction company argues the lender did just that, claiming that the lender, both "in preparation for and during the sale itself" engaged in conduct "specifically intended to affect the sale price or

---

[33] Cal. Civ. Code § 3439.07(a)(1). Notably, the construction company only raises this provision in its reply brief, but "[a]n appellant abandons all issues not raised and argued in its initial brief on appeal." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (emphasis omitted) (collecting cases). Nevertheless, we address this argument on its merits.

[34] *In re Bleaufontaine*, 634 F.2d at 1388 n.7.

14

control the outcome of the sale."[35] The construction company cites multiple data points: (1) the lender's control over "both the deed of trust and the [P]roperty encumbered by the deed of trust"; (2) the affiliate's name change; (3) the arrangement between the lender and r²; (4) the lender's engagement of an allegedly inadequate the real estate broker; (5) the lender's involvement in securing the stalking-horse bidder (who ultimately failed to make a bid); and, most importantly, (6) the bidding procedures themselves. The lender, on the other hand, argues that the construction company's data points are nothing more than "a false narrative, based upon contortions of the facts and misinterpretations thereof."

A deeper review betrays the construction company's argument. It first cites the lender's control over "both the deed of trust and the [P]roperty encumbered by the deed of trust." That the lender came to obtain both interests, however, is not nefarious *per se*. To the contrary, as the district court found, the lender obtained the deed to secure the loan and obtained the Property when the developer "defaulted on its loan with [the lender]," prompting the lender to exercise its contractual right, accelerate the loan, and strike an agreement to obtain the Property via its affiliated entity in lieu of foreclosure. The construction company argues that the lender "convinced" the developer to do so "for no stated consideration." The record shows otherwise. Here, the consideration given by the lender consisted of accepting the property *subject to the existing debts* as well as the promise to pay out 50 percent of future profits to the developer. This line of inquiry fails to show misconduct. It rather reflects a market actor responding to market forces and exercising its contractual rights.

---

[35] *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997).

The construction company also references the affiliate's name change from Hall Palm Springs II to RE Palm Springs II, asserting that this was "an attempt to minimize the appearance of control." That the bankruptcy court, the district court, and now this Court have the details of the transactions belies the idea that changing a name concealed any wrongdoing.[36]

The construction company next points to the fact that the lender was actually financing any payments to $r^2$, and $r^2$ also occasionally spoke with the lender. Neither fact demonstrates misconduct. The content of these few conversations, to the extent described in testimony, does not suggest malfeasance or misconduct. And regarding the financing, the construction company identifies no other means by which to pay for an objective third-party like $r^2$ to oversee the bankruptcy. In other words, as the district court concluded, "[a]lthough [the lender] maintained a form of control over $r^2$ as the DIP Lender, [the construction company] does not point to any facts or evidence showing that [the lender] *exerted this control* to commit a fraud upon the bankruptcy court."[37]

The construction company raises the lender's role in choosing the real estate broker as another datapoint. Even if the lender's authority to choose the broker was problematic in the abstract, the choice itself fails to evince bad faith, as the firm retained was "known [as a] national expert in the hospitality space" and staffed with "experts in California hotel sales." And even though the brokerage's managing director was not himself licensed in California, he

---

[36] *See, e.g.*, *E.E.O.C. v. Boeing Servs. Int'l*, 968 F.2d 549, 556 n.7 (5th Cir. 1992) ("We pause briefly to note that if the issue was before us, we would not hold that a cat was a dog simply because a defendant called the cat a dog." (citing William Shakespeare, *Romeo and Juliet*, act II, sc. ii ("What's in a name? That which we call a rose By any other name would smell as sweet."))).

[37] Emphasis added.

was a licensed broker elsewhere whose practice was "100 percent dedicated to the hotel space" and who had nearly a decade and a half of experience in the field. There was no error in declining to read bad faith into the lender's choice.

The construction company points to the lender's selection of the stalking horse bidder as giving rise to an inference of bad faith because "the stalking-horse bidder contract did not even contain a bid price." The construction company's recitation of the record omits vital details regarding the stalking horse, and specifically the consideration at issue. The stalking horse agreement reads:

> The consideration for the purchase of the Property shall be a purchase price to be mutually agreed upon between Purchaser and Seller prior to the expiration of the Due Diligence Period in an aggregate amount that is not less than an amount that is acceptable to [the lender] . . . with a specific Purchase Price dollar amount no later than two (2) Business Days after the expiration of the Due Diligence Period.

The stalking horse submitted a proposal for $35,450,000 at the August 24, 2020 hearing approving the sale motion, days before the deadline and above the amounts proposed in letters of intent by other potential bidders. While the stalking horse did not follow through on its proposed bid, failing to make the required deposit and then pulling out altogether, the credit bid was substantially higher than the proposed stalking horse bid—almost $2 million more, or 5% higher—undermining the construction company's questions of the stalking horse's failure to pony up, a question that would have purchase had the stalking horse's failure to bid resulted in a substantially *lower* final purchase amount. And as for allegations of collusive conduct, the broker testified that he never spoke with the lender regarding the credit bid. Thus, the construction company fails to marshal any evidence showing collusive

activity between the lender and the stalking horse calculated to scare off other bidders.

Finally, the construction company points to several of the bid procedures as setting the auction up for failure. The construction company asserts, for example, that the bid process was too short, inhibiting investors' ability to inspect the Property and conduct the requisite due diligence prior to the bid deadline. Yet the marketing campaign produced extensive interest, notwithstanding its purported brevity: 268 individuals executed confidentiality agreements for due diligence and seven different investor groups took a tour of the facility—four toured it multiple times, and one toured it five times. The process also produced multiple letters of intent for concededly noncompliant bids (*i.e.*, bids that did not conform to the timing and pricing requirements), though they were below the stalking horse's bid. Moreover, the district court correctly notes that when no conforming bids were made in the initial bidding timeline, the timeline was extended further and "came with incentives," namely "no Overbid Protections . . . and no break-up fee," exhibiting additional good faith efforts to solicit external investment. These facts all support the findings of the bankruptcy and district courts that the lender and the affiliate worked in good faith to effectuate a sale to a third party.[38]

In another bidding procedure-related contention, the construction company argues that because "the bid procedures gave [the lender] an absolute veto right over any bid submitted by any party," the lender set the procedures up to fail. But the bankruptcy court made clear that such an arrangement "is not uncommon" and is instead "just sort of the nature of

---

[38] So, too, does this undermine the construction company's argument that bad faith can be inferred because the bidding procedures did not require any party to market the facility. A lack of a duty to market bears not at all when compared to the actions undertaken.

the beast" in bankruptcy, cutting against an inference of bad faith. Moreover, there is no evidence in the record that bidders were in any way impaired or chilled by such a dynamic, further undermining any inference the construction company would ask this Court to make.

Indeed, despite the construction company's protests, the facts substantiate rather than undermine the lender's status as a "good faith purchaser." That the lender disclosed each of the salient facts to the bankruptcy court strongly favors a finding of good faith, as courts properly look to the transparency of the process as indicative of one's intent.[39] The disclosures, in concert with the lender's actions to market the Property (including the lender's actions to facilitate the marketing campaign such as "offer[ing] to provide financing to prospective purchasers"), the extension of the marketing process, and the timing of the lender's credit bid—after all other prospective buyers had fallen through—satisfy the lender's burden of establishing itself as a good faith purchaser.

Nor can we look away from the circumstances framing the bid process and the decisions of the bankruptcy and district courts, namely the carrying costs associated with an unfinished property and the Covid-19 pandemic. Testimony shows that the monthly carrying costs were approximately $70,000 and no alternative financing was identified to cover these costs once the DIP loan expired. Given the Property's incomplete state and the expiring

---

[39] *See In re Xact Telesolutions, Inc.*, No. 05-CV-1230, 2006 WL 66665, at *6 (D. Md. Jan. 10, 2006) (collecting cases to demonstrate that when evaluating a party's status as a good faith purchaser, "courts have considered whether the sale involved full disclosure to the court," which militates strongly in favor of finding good faith); *cf. Old Cold, LLC*, 558 B.R. 500, 516 n.6 (B.A.P. 1st Cir. 2016) (holding that, in some circumstances, an insider sale is to be encouraged "so long as the insider status is disclosed at the beginning of the case, and there is no evidence of collusion" (citing *Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 939 (7th Cir. 2006)), *aff'd sub nom. In re Old Cold LLC*, 879 F.3d 376 (1st Cir. 2018).

funding, the bankruptcy court accurately described the Property as "a wasting asset." This further empties the argument that the short timetable—itself a debated proposition—gives rise to an inference of bad faith.

The Property was conveyed from the developer to the affiliate on March 13, 2020, and the Grant Deed is dated March 27, 2020, just as the COVID-19 pandemic—and corresponding lockdowns—began to spread across the country.[40] The pandemic not only destabilized the current market, but also created questions about how the industry would look and operate in a post-COVID world. Put simply, the pandemic dramatically changed not only the lender's plans for the Property, but it also severely impacted the affiliate's ability to market and sell a hotel, particularly an unfinished one. In sum, these two factors must also be weighed in considering whether any of the actions or procedures, particularly with regard to pricing or timing issues, were performed in bad faith or as a result of sub-optimal external forces beyond the lender's control.

The record facts, framed by the external context and circumstances, make plain that there is no error in the judgments of the able bankruptcy and district courts. The lender did not engage in fraud and was a "good faith purchaser."

\* \* \* \*

We AFFIRM.

---

[40] *See Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 460 (5th Cir. 2021) ("As all are painfully aware, in early 2020 our nation was gripped with an unprecedented public health emergency caused by COVID-19. On March 11, 2020, the World Health Organization ('WHO') declared a global pandemic in response to the spread of COVID-19."); *see also In re Approval of the Jud. Emergency Declared in the S. Dist. of California*, 955 F.3d 1135, 1136 (9th Cir. 2020) ("The Governor of the State of California declared a Proclamation of a State of Emergency to exist in California on March 4, 2020.").