# United States Court of Appeals for the Fifth Circuit

No. 23-10603

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2024

Lyle W. Cayce
Clerk

In the Matter of RE Palm Springs II, L.L.C.

*Debtor*,

SR Construction Incorporated,

*Appellant*,

*versus*

RE Palm Springs II, L.L.C.; Hall Palm Springs, L.L.C.,

*Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-2734

_____

Before Barksdale, Southwick, and Graves, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

The appellant in this case, SR Construction ("SRC"), is a construction company that was hired to build a hotel in the California desert. But SRC was terminated before the hotel was finished, leaving it with a demand for $14 million in unpaid work. First, SRC tried to stop the sale of the hotel from a new owner to a bankruptcy creditor. That failed. Then it held

onto doors, stairs, HVAC equipment, and other personal property left over from the hotel project. The bankruptcy court ordered SRC to turn over the personal property. SRC appealed.

SRC challenges the bankruptcy court's power to order the turnover, as well as the validity of the most recent hotel owner's claim to the personal property. We conclude that the bankruptcy court's order is part and parcel of its undisputed power to order the sale of a bankruptcy debtor's assets. We also reject SRC's arguments about ownership of the assets in this case. Accordingly, we AFFIRM.

## I. BACKGROUND

Palm Springs, L.L.C. ("Palm Springs") hired SRC to build a hotel in California. When construction was just over halfway complete, Palm Springs terminated SRC. Nine days later, Palm Springs defaulted on its loan from the hotel's financier, Hall Palm Springs, L.L.C. ("Hall").

To avoid foreclosure, Palm Springs conveyed the hotel property to an entity called RE Palm Springs II, L.L.C. ("RPS"), which was formed by Hall for the purpose of taking title to the hotel.[1] In exchange, Hall released Palm Springs from its loan obligations. The bill of sale for the hotel explained that RPS acquired all "furniture, furnishings, equipment, machinery, goods" and "all other personal property of any kind or character."

RPS also took title subject to SRC's mechanic's lien. By SRC's calculation, Palm Springs still owed it and its subcontractors over $14 million. SRC sought to foreclose on its lien in California state court.

RPS planned to complete the hotel until COVID-19 derailed its plans. Instead, it filed for bankruptcy. The bankruptcy court authorized RPS to

---

[1] At the time, RPS was named Hall Palm Springs II, L.L.C.

borrow funds from Hall and approved RPS and Hall's plan to auction the hotel property. When it failed to sell at auction, the bankruptcy court approved the outright sale of RPS's assets to Hall ("Sale Order").

The court-approved Purchase Agreement provided for the sale of substantially all of RPS's assets to Hall, including the partially completed hotel and all its personal property. The bankruptcy court "retain[ed] jurisdiction to enforce and implement the terms and provisions of [the] Order and the Purchase Agreement," including, if needed, to "compel delivery of the Purchased Assets to [Hall]."

SRC appealed the Sale Order. The appeal went first to the district court, which exercised appellate jurisdiction under 28 U.S.C. § 158(a) but subsequently dismissed the appeal as moot under 11 U.S.C. § 363(m). *SR Constr., Inc. v. RE Palm Springs II, L.L.C.* (*In re RE Palm Springs II, L.L.C.*), No. CV 20-3486, 2021 WL 5331001 (N.D. Tex. Nov. 15, 2021). This court affirmed the dismissal and the Supreme Court denied certiorari. *SR Constr., Inc. v. Hall Palm Springs, L.L.C.* (*Matter of RE Palm Springs II, L.L.C.*), 65 F.4th 752, 757–58 (5th Cir. 2023), *cert. denied sub nom. SR Constr., Inc. v. RE Palm Springs II, L.L.C.*, 144 S. Ct. 327 (2023).

Meanwhile, SRC claimed ownership of various items of hotel-related personal property from the project such as doors, stairs, and HVAC equipment ("Personal Property"). Before the sale closed, Hall and RPS had jointly moved the bankruptcy court to order SRC to turn over certain personal property; after it closed, they expanded their motion to encompass additional items. The bankruptcy court granted the motion ("Turnover Order").

SRC appealed, challenging the bankruptcy court's jurisdiction to order the turnover and raising whether RPS, and then Hall, ever obtained title to the Personal Property in the first place. The district court affirmed. It

concluded that the bankruptcy court had jurisdiction to interpret and enforce the Sale Order. In more detailed findings, it also affirmed the bankruptcy court's conclusion that Hall had obtained title to the Personal Property and had not waived its right to the Personal Property by taking it "as is."

This appeal followed.

## II. STANDARD OF REVIEW

In appeals from the district court's review of bankruptcy court matters, we focus on the bankruptcy court's determinations. *Off. Comm. of Unsecured Creditors v. Moeller* (*In re Age Ref., Inc.*), 801 F.3d 530, 538 (5th Cir. 2015). We apply the same standard of review that applied in the district court. *VSP Labs, Inc. v. Hillair Cap. Invs., L.P.* (*Matter of PFO Glob., Inc.*), 26 F.4th 245, 252 (5th Cir. 2022). Because the district court here determined that the Turnover Order was a "core" bankruptcy matter, it reviewed the bankruptcy court's conclusions of law de novo and its factfinding for clear error. *See Bass v. Denney* (*In re Bass*), 171 F.3d 1016, 1021 (5th Cir. 1999). For "non-core" matters, the standard is de novo for both legal and factual conclusions. 28 U.S.C. § 157(c)(1).

## III. DISCUSSION

SRC advances the same arguments here as it advanced below. We address each in turn, as well as Hall's argument that the appeal is moot under the Bankruptcy Code.

### a. Subject matter jurisdiction

We always start with subject matter jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). SRC raises several arguments in support of its assertion that the bankruptcy court lacked subject matter jurisdiction to enter the Turnover Order. First, it argues that federal bankruptcy jurisdiction

did not exist because the turnover would not affect the bankruptcy estate.[2] It also argues that Hall lacked standing to move the bankruptcy court for turnover and that the Sale Order rendered moot RPS's ability to seek any relief relating to the Personal Property.

Federal courts have jurisdiction over matters that (1) arise under the provisions of the Bankruptcy Code; (2) arise in bankruptcy litigation; or (3) relate to the resolution of a bankruptcy proceeding. 28 U.S.C. § 1334(b). Bankruptcy cases are generally assigned to the bankruptcy court, *see* 28 U.S.C. § 157(a), which is a "unit of the district court," 28 U.S.C. § 151.

The bankruptcy court's powers are further delineated by 28 U.S.C. § 157. Under § 157, the bankruptcy court may hear and render judgment in matters arising under the provisions of the Bankruptcy Code and matters that arise in those cases (that is, matters (1) and (2) above). *See Stern v. Marshall*, 564 U.S. 462, 474 (2011). Such matters are called "core" matters. *Id.* The third type of matter—those only "related to" a bankruptcy proceeding—are "non-core." *Id.* at 475, 477. In non-core matters, the bankruptcy court cannot render judgment; instead, it must submit its proposed findings to the district court. *Id.* at 475. Non-core/"related-to" matters represent the bankruptcy court's power at its lowest ebb. *See Wood v. Wood* (*Matter of Wood*), 825 F.2d 90, 93 (5th Cir. 1987).

Hall argues that because the bankruptcy court had jurisdiction to enter the Sale Order, it also had jurisdiction to interpret and enforce the Sale Order through the Turnover Order. SRC counters, in part, that in entering the Turnover Order, the bankruptcy court did not interpret and enforce the Sale

---

[2] The filing of a bankruptcy case creates the bankruptcy estate, a legal entity that includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Order but made a legal determination about ownership of the Personal Property that went beyond the Sale Order's terms.

First, it is undisputed that the bankruptcy court had jurisdiction to enter the Sale Order. That power is conveyed to the bankruptcy court directly by statute. 11 U.S.C. § 363(b)(1); *see also* 28 U.S.C. § 157(b)(2)(N).

The scope of the Sale Order is, of course, set by its terms. It stated that the sale included the hotel as well as "all related assets to be purchased . . . by Hall . . . pursuant to the terms of the [Purchase Agreement]." The Purchase Agreement included "[a]ll now existing or hereafter acquired furniture, furnishings, equipment, machinery, appliances, and other tangible personal property of Seller."

The Sale Order also contained provisions requiring that Hall actually receive the Personal Property. It provided for delivery of the purchased assets. It authorized Hall to "take all other action necessary to effectuate the relief granted" in the Sale Order and to "undertake such other actions as may be reasonably necessary or appropriate to complete the Sale." And, finally, the bankruptcy court "retain[ed] jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer; and (b) resolve any disputes arising under or related to the Purchase Agreement."

The Turnover Order was within the scope of those terms. In determining whether the Personal Property was within the scope of the Sale Order, the bankruptcy court made only the findings necessary to enforce the terms of the Sale Order and the attached Purchase Agreement. It then ordered the delivery of the Personal Property, as the Sale Order clearly contemplated. We conclude, therefore, that the Turnover Order interpreted and enforced the Sale Order. We perceive no expansion of the Sale Order's terms in the Turnover Order.

Moreover, because the Turnover Order merely interpreted and enforced the Sale Order, it was within the bankruptcy court's jurisdiction. Federal courts have the "unquestionable power to enforce [their] own decrees." *Vikas WSP, Ltd. v. Econ. Mud Prod. Co.*, 23 F.4th 442, 452 (5th Cir. 2022); *see also Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993) ("[N]o independent basis of jurisdiction is required" when an order "protect[s] or effectuate[s] [the court's] judgment[]."). The scope of that "ancillary jurisdiction" is determined by the scope of the court's jurisdiction to enter the predicate order. *Vikas*, 23 F.4th at 452.

The Supreme Court's bankruptcy decision in *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 151 (2009) is in accord. Plaintiffs sued the insurer of a bankruptcy debtor in state court. *Id.* at 142–43. The insurer moved in the bankruptcy court to enjoin the plaintiffs' claims. *Id.* at 143. It argued that the claims violated an order of the bankruptcy court, entered some sixteen years earlier, enjoining anyone from bringing any claim relating to the debtor's insurance coverage. *Id.* The bankruptcy court granted the motion. *Id.* at 144.

On appeal, the Second Circuit reversed. *Id.* at 146. It concluded that the bankruptcy court lacked jurisdiction because it "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate." *Id.* at 147.

But the Supreme Court reversed. *Id.* at 156. It concluded that the bankruptcy court "plainly had jurisdiction to interpret and enforce its own prior order[]" enjoining insurance-related claims. *Id.* at 151. Moreover, any argument that the bankruptcy court lacked subject matter jurisdiction to enter the original order enjoining claims against the insurer was, at that point, barred by res judicata. *Id.* at 154.

At bottom, SRC advances an argument that *Travelers* clearly rejected—that some independent source of jurisdiction was required for the

bankruptcy court to enforce a prior lawful order. *See also Royal Ins. Co.*, 3 F.3d at 881.

To assess the scope of the bankruptcy court's authority to do what it did in this case, however, we still must determine whether the Turnover Order is a core or non-core matter. *See Stern*, 564 U.S. at 474. We begin by noting that the Sale Order is clearly a core matter. A matter is core if it "invokes a substantive right provided by [the Bankruptcy Code] or . . . by its nature, could arise only in the context of a bankruptcy case." *Wood*, 825 F.2d at 97. The Sale Order fits the bill. The Bankruptcy Code sets forth the substantive right to the sale of estate property. 11 U.S.C. § 363(b)(1). Additionally, 28 U.S.C. § 157(b)(2) contains an illustrative list of core matters, including subdivision (b)(2)(N), specifying "orders approving the sale of property." The question, then, is whether the Turnover Order also "invokes a substantive right provided by Title 11" or is a matter that could "arise only in the context of a bankruptcy case." *Wood*, 825 F.2d at 97.

When Congress used the word "core," it meant to "describe matters or proceedings that are an integral part of the bankruptcy case." *Southmark Corp. v. Coopers & Lybrand* (*In re Southmark Corp.*), 163 F.3d 925, 930 (5th Cir. 1999). In *Southmark*, we considered whether malpractice claims were core when a debtor sought to bring them against a fiduciary for alleged misconduct in a bankruptcy case. *Id.* They were, we explained, because they were "inseparable from the bankruptcy context." *Id.* at 931. For one, the fiduciary relationship itself was created within the bankruptcy. *Id.* at 930–31. For another, "a sine qua non in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries." *Id.* at 931.

The Second Circuit applied a similar analysis, but in a context more analogous to the case at bar, in *Luan Investment S.E. v. Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304 F.3d 223 (2d Cir. 2002). A bankruptcy creditor—

the debtor's former landlord—sought to collect unpaid back rent from another creditor, who had purchased the debtor's lease in a bankruptcy sale. *Id.* at 226. But the sale order related to the lease had explicitly stated that the purchaser had *not* acquired the debtor's existing liabilities. *Id.* The purchaser moved to enforce the sale order and enjoin the landlord from chasing the purchaser for the back rent. *Id.* at 227.

The creditor, in turn, challenged the bankruptcy court's jurisdiction to get involved in "a post-sale contract dispute between two non-debtors." *Id.* at 228. The Second Circuit ruled that jurisdiction existed and that enforcement of the sale order was core. *Id.* at 230. Three factors informed its conclusion. *Id.* at 229–30. First, the dispute was based solely on rights created by the sale order because it was based on the purchaser's ownership of the lease. *Id.* Second—foreshadowing *Travelers*—the bankruptcy court had continuing authority to interpret and enforce the sale order. *Id.* at 230. Third, the back rent dispute was a continuation of the bankruptcy court's administration of the estate and its adjudication of the claims against the estate—core bankruptcy functions—because the creditor's claims for unpaid rent had been raised there first. *Id.* Those three factors, and perhaps any one of them alone, dictated that the enforcement order was core because they showed that the enforcement order was "uniquely affected by and inextricably linked to" the sale order. *Id.*; *see also In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir. 1991) (concluding that enforcement order was core because it is "directly analogous" to a sale order).

We apply our reasoning in *Southmark* and the Second Circuit's analysis in *Luan* and conclude that the Turnover Order is also "integral to," "inseparable from," and "inextricably linked to" the bankruptcy case and, therefore, core. The Turnover Order is based entirely on the Sale Order's purported creation of certain property rights. In entering the Turnover Order, the bankruptcy court invoked its continuing authority to interpret and

enforce the Sale Order. SRC, like the fiduciary in *Southmark* and the landlord in *Luan*, "is not a stranger to the bankruptcy case." *Southmark*, 163 F.3d at 931–32; *Luan*, 304 F.3d at 230. It previously challenged the Sale Order directly in the bankruptcy proceedings. And a sine qua non in effectuating sales of assets is the court's ability to see that those sales are completed.

SRC principally relies on a Seventh Circuit case, *Matter of FedPak Systems, Inc.*, 80 F.3d 207, 214 (7th Cir. 1996). SRC reads *FedPak* to set forth two principles contrary to our conclusions here: first, that the bankruptcy court lacks jurisdiction because a non-debtor such as Hall lacks standing to seek turnover in the bankruptcy court, and second, that the bankruptcy court lacks jurisdiction over property that is no longer part of the estate. We examine each in turn and ultimately find *FedPak* inapplicable.

*FedPak* concerned a bankruptcy court's effort to resolve tension between two of its orders. First, the court issued a judgment conveying certain of the debtor's patent and "know-how" rights to one of its creditors. *FedPak*, 80 F.3d at 210. Then, it authorized sale to another creditor of all of the debtor's intellectual property, in exchange for royalty payments to the debtor's estate. *Id.* Two years later, the debtor moved the bankruptcy court to clarify the competing rights of its two creditors. *Id.* It argued that the potential for confusion could result in missed royalty payments or claims against the bankruptcy estate. *Id.* at 212.

The Seventh Circuit found jurisdiction lacking for two alternative reasons. First, it concluded that the debtor lacked a concrete, particularized injury, as required for constitutional standing, because the potential harm it faced was completely hypothetical. *Id.*

SRC similarly argues that Hall lacked standing and therefore that the bankruptcy court lacked jurisdiction. Unlike the debtor in *FedPak*, however, Hall alleges a concrete, particularized injury—its ability to receive the

No. 23-10603

property it purchased in the sale. But SRC relies less on the constitutional analysis of *FedPak* and more on 11 U.S.C. § 542(a), which it says gives only a debtor or its trustee the power to seek turnover of estate assets, not a non-debtor such as Hall.[3]

Its argument misses the mark for two reasons. One, it confuses the procedural requirements of the Bankruptcy Code with the constitutional requirements of standing. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). Hall's alleged injury clearly satisfies the baseline requirements of constitutional standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Two, it misreads the statute. Section 542(a) requires entities in possession of estate property to deliver that property to the estate. It does not *preclude* an entity from seeking an order requiring turnover, nor does it prohibit the court from ordering that relief.

Nor does SRC offer any other persuasive authority barring non-debtors from seeking bankruptcy-related relief in the bankruptcy court that they have constitutional standing to seek. To the contrary, the *Travelers* and *Luan* courts both favorably resolved motions brought by non-debtors for miscellaneous relief related to enforcement of prior orders. In fact, even the court in *FedPak* opined that one of the creditors could move for relief in bankruptcy court if its property rights were later imperiled. *FedPak*, 80 F.3d at 212. Because Hall had a concrete, particularized interest threatened by SRC's refusal to turn over the Personal Property, and because enforcement of the Sale Order was a core matter within the bankruptcy court's jurisdiction, Hall had standing.

---

[3] "[A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

The *FedPak* court also affirmed dismissal of the debtor's motion on an alternative ground. It concluded that the motion was not even a non-core "related to" matter because the intellectual property at issue was no longer part of the bankruptcy estate. *Id.* at 214. "[B]ankruptcy court jurisdiction does not follow property that is sold," the Seventh Circuit explained— "rather, that jurisdiction lapses when property leaves the estate." *Id.* (cleaned up).

Here, SRC argues that if we agree with the bankruptcy court's findings, then the Personal Property conveyed to Hall by the Sale Order is no longer part of RPS's bankruptcy estate, and thus the bankruptcy court's jurisdiction lapsed.

We agree that this would be a straightforward application of *FedPak*. But SRC's argument faces two insurmountable hurdles. First, SRC fails to account for *Travelers*, which was decided thirteen years after *FedPak*. Under *Travelers*, the bankruptcy court *at least* had "related to" authority to enforce the Sale Order, even if the Turnover Order itself did not affect the bankruptcy res. *See Travelers*, 557 U.S. at 148.

Second, the Seventh Circuit recently "qualified" this part of *FedPak* in *Bush v. United States*, 100 F.4th 807 (7th Cir. 2024). It explained that courts must determine the scope of their jurisdiction based on the state of things at the *inception* of a bankruptcy matter, not at its disposition:

> If the related-to jurisdiction really depends on how things look at the end of the bankruptcy—if jurisdiction turns, for example, on how many other claims eventually are presented—then authority cannot be determined at the time of filing. Yet one of the most fundamental rules of federal jurisdiction is that judicial authority depends on the state of affairs when a case begins (equivalently, when a claim is filed in bankruptcy) rather than on how things turn out.

12

. . .

> [T]aking th[e] ex post view would contradict the norm that jurisdictional issues must be resolved ex ante, not in light of how things turn out.

*Id.* at 812, 813; *see also Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004).

We agree that this is the sounder jurisdictional approach. Under Supreme Court precedent, the scope of the bankruptcy court's jurisdiction is best viewed in light of the state of play at the "time of filing"—the closest equivalent here being either the initiation of bankruptcy proceedings or the entry of the Sale Order. *See Grupo Dataflux*, 541 U.S. at 571. RPS's sale of its property in the bankruptcy court did not preclude the bankruptcy court from taking action to enforce that sale.[4]

In sum, we conclude that the bankruptcy court had jurisdiction to enter the Turnover Order because that order interpreted and enforced the Sale Order. We also conclude that because the Turnover Order is integral to and inseparable from RPS's bankruptcy, it is a core matter. We therefore conclude that issuing the Turnover Order was entirely within the bankruptcy court's authority.

### b. Statutory mootness

Hall raises its own argument bearing on the power of the court to hear this case. It argues that 11 U.S.C. § 363(m) prevents us from deciding the appeal on statutory mootness grounds. Section 363(m) provides that any

---

[4] Because we conclude that Hall had standing to move for enforcement of the Sale Order, we do not reach SRC's alternative mootness argument as to RPS. We also do not reach Hall's argument that SRC consented to federal jurisdiction, though we pause to note that as a fundamental matter subject matter jurisdiction is not waivable. *Sarmiento v. Tex. Bd. of Veterinary Med. Exam'rs*, 939 F.2d 1242, 1245 (5th Cir. 1991).

No. 23-10603

appeal that seeks "reversal or modification" of a bankruptcy sale is moot if the sale was not stayed pending appeal and the property was sold to a good-faith purchaser.[5] *See Gilchrist v. Westcott* (*In re Gilchrist*), 891 F.2d 559, 560 (5th Cir. 1990). It is undisputed that the Sale Order was not stayed, and we previously determined that Hall was a good-faith purchaser. *See RE Palm Springs II*, 65 F.4th at 762, 765.

A party's request for reversal or modification of a sale on appeal is only moot if it would "affect the validity of [the] sale." 11 U.S.C. § 363(m). A reversal or modification only affects the validity of the sale if it is "integral" to the sale. *Newco Energy v. Energytec, Inc.* (*In re Energytec, Inc.*), 739 F.3d 215, 220 (5th Cir. 2013). A provision is integral if it "would adversely alter the parties' bargained-for exchange." *Id.* (quoting *In re Trism, Inc.*, 328 F.3d 1003, 1007 (8th Cir. 2003)). Hall contends that SRC attacks an integral aspect of the Sale Order because if we conclude that SRC is the owner of the Personal Property, then we would materially alter the terms of the sale.

We disagree. SRC argues only that the Sale Order's reference to "tangible personal property" does not encompass the Personal Property at issue. Contrast that with cases where we have concluded that an appeal challenged an integral aspect of a sale. In one case, an unsecured creditor objected to a settlement agreement that was an "essential feature of the sale," such that, if undone, it would have undone the entire sale. *New Indus., Inc. v. Byman* (*Matter of Sneed Shipbuilding, Inc.*), 916 F.3d 405, 408, 410 (5th Cir. 2019).

---

[5] "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

14

In another case, a creditor argued that § 363(m) did not bar its challenge because it sought only to void an amended sale order. *Off. Comm. of Unsecured Creditors of Walker Cnty. Hosp. Corp. v. Walker Cnty. Hosp. Dist.* (*Matter of Walker Cnty. Hosp. Corp.*), 3 F.4th 229, 235 (5th Cir. 2021). But the amended sale order could not be separated from the sale itself; the amended order was, in fact, the order that actually authorized the sale to take place. *Id.* at 235–36.

Indeed, in its prior appeal in this very case, SRC's challenge to Hall's good-faith status necessarily would have undone the entire Sale Order. *See RE Palm Springs II*, 65 F.4th at 759.

Hall has not shown that acknowledging SRC's ownership of the Personal Property would invalidate the underlying sale here in that way. Hall argues that we "would undercut the bargained-for exchange and [Hall's] expectation that it was acquiring not only the physical [h]otel but also the construction components necessary for its completion." But Hall does not demonstrate that the conveyance of the Personal Property was "integral" to the overall sale such that the two were "mutually dependent." *New Industries*, 916 F.3d at 410.

Because Hall has not shown that its purchase of RPS's assets was contingent on taking title to the Personal Property, we reject its § 363(m) argument.

### c. Title to the Personal Property

On the merits, SRC argues that the Personal Property was never part of RPS's bankruptcy estate and, therefore, title to the Personal Property was not conveyed via the Sale Order. SRC takes aim at every link in the transactional chain between Palm Springs, the original owner of the hotel property, and Hall, the latest owner.

No. 23-10603

*i. Transfer from SRC to Palm Springs*

SRC argues that Palm Springs itself never acquired title to the Personal Property because Palm Springs never paid SRC in full for its services. SRC also contends that certain waivers SRC signed stating that it had been paid do not show that it was paid *in full*. Hall counters that any time Palm Springs tendered periodic payments to SRC, any hotel-related property that SRC possessed at that time was conveyed to Palm Springs.

We must first consider the agreement between the parties. Each party's argument depends entirely on the terms of the construction contract between SRC and Palm Springs. Because contract interpretation is a question of law, the standard of review is de novo. *Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 674 (5th Cir. 2023).

Neither party disputes that California law governs the construction contract.[6] Under California law, the first rule of contract interpretation is to give effect to the parties' mutual intent, and to do so, if possible, solely from the wording of the contract itself. Cal. Civ. Code §§ 1636, 1639.

We must determine, then, whether under the contract's plain terms Palm Springs was required to pay SRC in full before Palm Springs could obtain title to the Personal Property, or whether it obtained title in increments each time it tendered payment to SRC. The contract contains several relevant provisions. First, section 9.3.2 provides that "payments shall be made [by Palm Springs to SRC] on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation" into the hotel. The next provision, section 9.3.3, provides that if SRC submitted an "Application for Payment"—basically, a detailed invoice—for materials,

---

[6] SRC advances alternative arguments under Texas law, which we do not reach.

title to those materials would "pass to [Palm Springs] no later than the time of [Palm Springs's] payment."

Read together, the above sections outline the following course of performance: SRC would purchase materials and deliver them to the hotel site; SRC would then submit an Application for Payment to Palm Springs for those materials; Palm Springs would then pay SRC for those materials, and upon payment (at the latest), title to the materials transferred to Palm Springs.

Nevertheless, SRC argues that another provision required Palm Springs to pay it in full before title could pass. Section 7.4.2 provides that "[n]o advances [will be made] for building materials or furnishings that are not yet incorporated into the Project ("stored materials") unless . . . " and then sets forth six separate conditions. As relevant here, the first condition says that Palm Springs must "ha[ve] good title to the stored materials"; the fourth says that the materials must "have been paid for in full or will be paid for with the funds to be advanced and all lien rights and claims of the supplier have been released or will be released upon payment with the advanced funds."

SRC interprets the fourth condition—that materials "have been paid for in full"—to mean that Palm Springs must pay SRC in full for *all* stored materials to receive title to *any* of them. But that interpretation makes little sense in context. Section 7.4.2 clearly enumerates conditions that *SRC* must satisfy in order to receive advance payment from *Palm Springs*. The more logical reading is that, like the other conditions, the fourth condition constrains SRC's actions, not Palm Springs's, and therefore requires *SRC* to pay in full for any property that *it* acquires from its supplier, and to ensure that the property is free of liens and claims, before title to that property may pass to Palm Springs. *See Reg'l Steel Corp. v. Liberty Surplus Ins. Corp.*, 173

Cal. Rptr. 3d 91, 100 (Cal. Ct. App. 2014) (explaining that in contract interpretation, "reliance on the common understanding of language is bedrock," but "equally important are the requirements of reasonableness and context.") (cleaned up).

That interpretation not only makes more sense in the context of section 7.4.2, but it also accords with section 9.3.3, which provides that Palm Springs would obtain title "no later than the time of payment"—not upon "payment in full." Moreover, section 9.3.3 and section 7.4.2 would plainly conflict if section 7.4.2 provided that Palm Springs could not take title until *after* it paid SRC—and under California law, we must avoid such conflicts in terms. *See* CAL. CIV. CODE § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). We conclude that the contract did not require payment in full.

We now must determine whether Palm Springs in fact did obtain title. The bankruptcy court determined that it did because the parties followed the course of performance outlined in the contract. The court found that SRC submitted twenty-three Applications for Payment to Palm Springs; that each application contained an accounting of SRC's expenses; that twenty of those applications covered the entirety of the Personal Property at issue here; and that, for each of those same twenty applications, SRC also executed an "Unconditional Waiver and Release On Progress Payment" form acknowledging it had been paid for materials described in the application and waiving its rights over those materials.[7] The bankruptcy court concluded that

---

[7] The Unconditional Waiver and Release On Progress Payment form states, in relevant part, that the form

WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU

the applications and waivers demonstrated that Palm Springs paid for, and obtained title to, all of the Personal Property.

SRC does not quite dispute those findings. Instead, it argues that, under California law, the unconditional waiver forms that it signed pertained only to final payments, as opposed to progress payments, and therefore do not serve as evidence of payment in full. That argument goes nowhere at this point because we have already concluded that the construction contract did not require Palm Springs to pay SRC in full. At most, the contract required Palm Springs to pay for each delivery of Personal Property before it could take title to that Personal Property. Because SRC does not challenge the bankruptcy court's conclusion that those payments were made, we also affirm the determination that title to the Personal Property passed from SRC to Palm Springs.

### ii. Transfer from Palm Springs to RPS

Next, SRC argues that even if Palm Springs obtained title, title did not pass to RPS. It argues that, while the bill of sale conveying Palm Springs's assets to RPS *did* refer to the Personal Property, the bill of sale also stated that "not all of [those materials] have been paid for yet and any such unpaid items will need to be paid for by [RPS]."

Because we have concluded that Palm Springs did obtain title to the Personal Property, this argument lacks force. The bill of sale states the obvious—that Palm Springs conveyed to RPS only what it already owned. And indeed, the bankruptcy court concluded that Palm Springs had failed to

---

HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.

pay for *some* items of personal property—but none of that property is at issue. Because we conclude that Palm Springs owned the disputed Personal Property, title was unaffected by the provision that SRC cites. We accordingly affirm the conclusion that title to the Personal Property passed from Palm Springs to RPS via the bill of sale.

### iii. Transfer from RPS to Hall

Finally, SRC argues that because Hall purchased RPS's assets "as is," it waived any right to assets such as the Personal Property that it was not able to immediately obtain. The Sale Order and the Purchase Agreement both specified that Hall's purchase of RPS's assets was "as is," "where is," and "with all faults." And SRC correctly asserts that a buyer who takes property "as is" under California law "takes the property in the condition visible to or observable by him." *Lingsch v. Savage*, 29 Cal. Rptr. 201, 209 (Cal. Ct. App. 1963).

But SRC misapplies that rule. It does not limit a buyer's entitlement to the actual things it purchased—it only prevents the buyer from holding the seller liable for a defect in the quality or condition of those things. *Shapiro v. Hu*, 233 Cal. Rptr. 470, 475–76 (Ct. App. 1986). Hall does not seek to hold RPS liable for the quality, condition, or even the location of the Personal Property. It seeks to take possession of the Personal Property. The "as is" provisions did not prevent turnover of the Personal Property.

## IV. CONCLUSION

The bankruptcy court had the authority to hear this matter and its disposition was correct in all respects. We AFFIRM.